UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MOHAMAD I. JABER,

    Plaintiff,                                   Civil Action No. 04-72399

v.                                          HON.  NANCY G. EDMUNDS
                                                  U.S. District Judge
                                                  HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Mohamad I. Jaber, brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying his application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On July 10, 2001, Plaintiff filed an application for Disability Insurance Benefits (DIB),  alleging an onset of disability date of November 10, 2000 (Tr.  42-44).  After the initial denial of his claim, Plaintiff filed a timely request for an administrative hearing,

conducted on July 8, 2003 in Detroit, Michigan before Administrative Law Judge (ALJ) Paul Armstrong.  Plaintiff, represented by attorney William Ebayed Mostafa, testified (Tr. 252-264).  Rihav Jaber, Plaintiff's wife, testified on his behalf (Tr. 264-266).  Medical Expert, Dr. Voelpel testified (Tr. 266-272), as did John Stokes, acting as Vocational Expert (VE) (Tr. 272-274).  ALJ Armstrong found Plaintiff not disabled at "Step Two" of his analysis (Tr. 18, 23). On December 30, 2003, the Appeals Council denied review (Tr. 6-7). Plaintiff filed for judicial review of the final decision on July 9, 2004.

## BACKGROUND FACTS

Plaintiff, born January 28, 1965, was age thirty-eight when the ALJ issued his decision (Tr. 17).  He graduated from high school and attended college for two years (Tr. 17).  Plaintiff's former work includes jobs as a clerk, cashier, and stocker (Tr. 17). Plaintiff alleges disability based on an November 10, 2000 work-related injury that created arm and neck pain and weakness, as well as back pain, numbness, shortness of breath, fatigue, dizziness and depression (Tr. 17-18).

### A.     Plaintiff's Testimony

On July 8, 2003 Plaintiff testified before ALJ Armstrong that he lived with his wife and three children in Dearborn, Michigan (Tr. 252-253) He reported that he had worked as a supermarket clerk for the past fifteen years (Tr. 254).  He stated that in November, 2000 he began experiencing neck pain at work (Tr. 254).  He testified that he sought treatment, but that the medication his physician prescribed did not relieve his pain (Tr. 255).  He testified that he experienced difficulty holding his head up straight and could not look from

side to side because of neck tension (Tr. 256). He reported that his medications made him drowsy (Tr. 256). He admitted that he could write his name, but stated that he could not lift anything, or even walk properly due to pressure and dizziness (Tr. 257). He stated that he received disability payments and that he had a workers' compensation case pending (Tr. 258).

Plaintiff stated that he possessed a driver's license, but did not drive due to his condition (Tr. 259). He denied walking any distance due to persistent dizziness (Tr. 259). He testified that could not watch television, read books, or listen to the radio (Tr. 260-261). He reported that he slept poorly (Tr. 261-262). He indicated that his lack of balance caused him to fall (Tr. 262-263). He reported that his physicians, whom he saw on a regular basis, suggested that he undergo botox injections for his pain (Tr. 262).

### B. Plaintiff's Wife

Rihav Jaber, Plaintiff's wife, testified that she witnessed her husband's fainting spell a month earlier (Tr. 265). In response to questions from the medical expert, Mrs. Jaber indicated that her husband had never undergone a psychiatric examination (Tr. 265). She stated that as the result of a small botox injection administered by his physician, his arm became paralyzed (Tr. 266).

### C. Medical Expert

Dr. Voelpel testified that the medical records submitted from 1998-2000 showed no "significant medical problems other than kidney stones" (Tr. 266). He noted that Plaintiff's

records from the time of his alleged injury in October, 2000 were not accompanied by physical findings (Tr. 266). He observed further that the laboratory studies included did not suggest structural, or inflammatory arthritis problems (Tr. 267). He stated that Plaintiff took only Tylenol for discomfort, noting that Plaintiff reported that a soft cervical collar he had used for a while had not relieved his pain (Tr. 267). He found no evidence indicating a structural defect of the weight-bearing joints (Tr. 267). He found further that "the records are devoid of information regarding an ear, nose and throat exam that would indicate subjective evidence of vertigo" (Tr. 267-268).

Prefacing his next opinion by stating that he was not a psychiatrist, he observed, based on Plaintiff's testimony at the hearing, that his activities of daily living appeared severely restricted (Tr. 269). He conjectured that Plaintiff's neck tension could be exacerbated by psychological tension rather than a "structural defect" (Tr. 270). He stated the ALJ's proposed residual functional capacity (RFC), which limited Plaintiff to sedentary work which required no neck rotation beyond 15 degrees horizontally or vertically, appeared to include all of Plaintiff's restrictions (Tr. 271).

### D.     Medical Evidence

In May, 1998, Antonio F. DeLara, M.O., M.D., noted that Plaintiff complained of the sudden onset of lower back pain (Tr. 170). Subsequent treatment notes show that Plaintiff was diagnosed with kidney stones (Tr. 177, 181). Notes from an October 18, 2000 examination indicate that Plaintiff was prescribed Vicodin (Tr. 184). On November 6, 2000, Plaintiff requested a muscle relaxer and on November 13, began taking Darvocet (Tr. 186-

187).  On November 29, 2000, he was prescribed Xanax after complaining of anxiety (Tr. 189). An MRI performed in late November showed no disc protrusion or spinal stenosis, indicating normal results (Tr. 122).  In June, 2001, Dr. DeLara opined that Plaintiff was precluded from work indefinitely due to cervical dystonia and spastic torticalis (Tr. 199-200).

In February, 2001 Robert C. Schwyn M.D., Ph.D., reported that Plaintiff had "been experiencing signs and symptoms that look like cervical dystonia," noting that it appeared to come on spontaneously (Tr. 123).  He referred Plaintiff to Yasser M. Awaad, M.D., M.Sc., who recommended Botox injections to relieve Plaintiff's cervical dystonia (Tr. 124).  On February 26, 2001, Jorge Torriglia, M.D., noted that Plaintiff complained of a nauseated feeling and burning on urination (Tr. 125).  A urinalysis yielded negative results (Tr. 125).

In March, 2001 Parmod Mukhi, M.D., a rehabilitation specialist, examined Plaintiff (Tr. 143-143).  Dr. Mukhi confirmed that both EMG and MRI testing yielded normal results (Tr. 141).  Plaintiff told Dr. Mukhi that his neck pain, which he described as "constant . . . with occasional spasms," had prevented him from working since November, 2000 (Tr. 141). Dr. Mukhi prescribed Lodine, Elavil, and Valium (Tr. 143).  Plaintiff told Dr. Mukhi at his next appointment that he had begun therapy and medication, indicating that he experienced "some good days and some bad days" (Tr. 144).  Notes from a late April, 2001 exam indicate that Plaintiff's work activities should be limited to "sit down work only with limited bending" (Tr. 148).  In May, 2001, manual muscle testing and a neurological examination showed normal results (Tr. 151).  Dr. Mukhi suggested undergoing trigger point injections (Tr. 152).  In June, 2001, Dr. Mukhi acknowledged that Plaintiff's test results to date were

"unremarkable," apparently citing a June 25, 2001 MRI result which showed no abnormalities (Tr. 132, 155). In July, 2001 Dr. Mukhi completed a form, stating that due to cervical dystonia, and spastic torticollis, Plaintiff, "totally disabled," was restricted to "sit down" activities only (Tr. 157-158). In August, 2001, he observed that Plaintiff's cervical tightness appeared to "intermittent," noting that upon direct examination, Plaintiff exhibited neck tension, but during questioning, Plaintiff appeared to be relaxed "and have good range of motion" (Tr. 161). He noted that Plaintiff possessed a full range of motion in all directions with full muscle strength (Tr. 161). In November and December, 2001 Dr. DeLara composed a letter stating that Plaintiff was "not able to maintain a job" at that time (Tr. 164). Noting that Plaintiff could not afford medication, he stated that he would provide him with samples (Tr. 164-165).

     A Physical Residual Functional Capacity Assessment completed in October, 2001 concluded that Plaintiff could lift twenty pounds occasionally and ten pounds frequently, retaining the ability to sit for about six hours in an eight hour workday and an unlimited ability to push and pull (Tr. 134). The Assessment noted that Plaintiff's allegations were not supported by medical information, concluding that Plaintiff retained the ability to perform sit down work (Tr. 134).

     Subsequent to Plaintiff's hearing, Iman F. Emenini, M.D., and Ahmad Anouti, M.D., submitted material indicating that Plaintiff experienced spasmodic torticollis, which was characterized by severe muscle spasm, limited neck motion, and dizziness (Tr. 238-239). Both physicians deemed Plaintiff totally disabled (Tr. 238-239).

A mental assessment performed in August, 2003 by John D. Jeter, Ph.D., indicated that Plaintiff scored a full scale IQ of 56, placed him in the mildly mentally impaired range of cognitive functioning (Tr. 217-218). Plaintiff denied receiving mental health treatment (Tr. 214). The examiner expressed doubt that Plaintiff's scores were valid, noting that although Plaintiff graduated from an American high school and had been a cashier in an American supermarket for fifteen years, he failed to demonstrate the ability "to add or subtract with any consistency" (Tr. 218). He assessed Plaintiff's GAF at 50, finding "[d]epression secondary to medical condition," noting that his appraisal of Plaintiff's medical limitations was based in part on medical reports indicating that he could not work[1] (Tr. 218).

### E.     Vocational Expert Testimony

VE John Stokes, stating that his testimony comported with information contained in the Dictionary of Occupational Titles (DOT), found that based on Plaintiff's allegations, he could not return to his past relevant work as a cashier (Tr. 272-273). The VE stated that the job of cashier, a semi-skilled position at the light exertional level, was precluded due to Plaintiff's alleged inability to remain on his feet for more than two hours in an eight hour

---

[1] A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34. (*DSM-IV-TR* ) (4th ed.2000).

workday (Tr. 272). ALJ Armstrong, composed the following hypothetical question for the VE:

> "Suppose we have a hypothetical individual limited to sedentary postural, but light exertional, so he can't be up on his feet more than two hours out of an eight-hour day, but he could lift up to 20 pounds occasionally and 10 pounds repetitively, no work requiring rotation of the neck beyond 15 degrees horizontally or vertically, no work at unprotected heights, around dangerous moving machinery, open flames, or bodies of water, and no work around vibration or heavy machinery" (Tr. 273).

VE Stokes testified that such an individual possessed the capability to perform 1,200 telephone operator jobs, 3,000 receptionist jobs, and 1,200 surveillance system monitor jobs in the southeastern Michigan economy (Tr. 272). The VE added surveillance system monitor positions would not contain any requirement for English speaking (Tr. 274).[2]

### F.     The ALJ's Decision

ALJ Armstrong stated that he found Plaintiff not disabled based on the lack of objective medical evidence supporting his allegations of severe impairments (Tr. 23)[3]. The ALJ cited 20 CFR §§ 404.1520(a)(c) and 404.1521(a)(b) in rejecting Plaintiff's

---

[2] After the VE finished testifying, the ALJ stated that he could not grant disability benefits based on Plaintiff's record (Tr. 274). Plaintiff's attorney requested additional time to allow Plaintiff to undergo psychological testing, stating that the absence of objective medical evidence supporting the claims was a result of Plaintiff's inability to pay for tests (Tr. 274). Dr. Voelpel recommended that Plaintiff should submit to a psychological evaluation (Tr. 275). The ALJ indicated that he would attempt to order a government sponsored evaluation (Tr. 275).

[3] The ALJ made his determination at "Step Two" of the disability analysis. *See Framework for Disability Determinations, infra.*

allegations, stating that he had failed to show that his "abnormality" could "reasonably be expected to cause the kind of symptoms he [alleged]" (Tr. 18).

The ALJ also found that neither Plaintiff nor Mrs. Jaber were credible, noting discrepancies in Plaintiff's accounts of his injury and lack of medical evidence confirming injury immediately subsequent to his accident (Tr. 18). He determined that the opinions of various physicians who found Plaintiff disabled should not be given any weight, due to their failure to cite "anything of an objective nature beyond muscle tightness or spasm in support of their opinion" (Tr. 20). He supported his conclusion by stating that he believed that "the evidence overwhelmingly shows that [Plaintiff], despite being diagnosed with cervical dystonia and spastic torticollis, lacks an impairment that has more than minimal effect on his ability to work" (Tr. 21). He also cited Plaintiff's lack of motivation on a standardized intelligence test as a basis for his credibility determination (Tr. 22).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way,

without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## **FRAMEWORK FOR DISABILITY DETERMINATIONS**

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A.  Step Two Determination

Plaintiff faults the ALJ for finding an absence of severe impairments at Step Two of the disability analysis. *Plaintiff's Brief* at 14. He argues that the administrative record demonstrates the existence of a severe impairment. *Id.*

20 CFR § 416.921(a) defines a non-severe impairment as one that does not "significantly limit [the] physical or mental ability to do basic work activities." Citing § 416.921, which defines basic work activities as "understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting," *Farris v. Secretary of HHS*, 773 F.2d 85, 89 (6th Cir. 1985), stated that "the second stage severity inquiry, properly interpreted, serves the goal of administrative efficiency by allowing the Secretary to screen out totally groundless claims." The court cautioned that an "overly stringent interpretation of the severity requirement would violate the statutory standard for disability by precluding administrative determination of the crucial statutory question [of] whether, in fact, the impairment prevents the claimant from working, given the claimant's age, education and experience." An impairment can be considered "not severe . . . only if the impairment is a 'slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience.' " *Farris,* 773 F.2d at 90; *Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir.1984).

Substantial evidence supports the ALJ's Step Two finding of non-disability. First, as stated above, the claimant bears the burden of proof at steps one through four of the disability analysis. *See Moore v. Secretary of HHS* 1994 WL 773513, 4 (E.D. Mich.1994); 42 USC § 423(d)(5)(A) ("In order for plaintiff to meet the initial burden in [S]tep [T]wo, it was incumbent upon her to present objective medical evidence in support of her claimed disabilities.") As discussed at length by the ALJ Armstrong, Plaintiff's allegations of limitations stood unsubstantiated by objective findings (Tr. 18).

Second, with regard to Plaintiff's claim that he was afflicted with cervical dystonia and spasmodic torticollis which somehow eluded detection using all objective medical tests, Dr. Voelpel noted at the hearing that cervical dystonia would be evidenced in an MRI scan and x-rays showing hypertrophy of the muscle groups due to prolonged muscle spasms (Tr. 268). He testified that none of Plaintiff's studies indicated such hypertrophy (Tr. 268). Further, Dr. Voelpel testified that individuals afflicted with spasmodic torticollis were "always shaking all over" (Tr. 268). None of Plaintiff's medical treaters reported that he experienced uncontrollable shaking.

Third, the ALJ permissibly based his Step Two finding in part on his rejection of Plaintiff's testimony.[4] The ALJ cited numerous reasons, supported by record evidence, for his credibility finding in accordance with *Social Security Ruling* (SSR) 96-7p, which states that it is not sufficient for the ALJ to make a single, conclusory statement that the

---

[4]The ALJ also rejected the opinions of all of the physicians who found Plaintiff disabled, which will be discussed in full in section **B**. (Tr. 20).

individual's allegations have been considered or that the allegations are or are not credible. *Id*, 1996 WL 362209, at 34484. The ALJ's decision must be based on specific reasons for the findings of credibility. *Id*.; *See also Howard v. Commissioner of Social Security,* 276 F.3d 235, 242 (6th Cir. 2002); *Heston v. Commissioner of Social Security,* 245 F.3d 528, 536 (6th Cir. 2001); *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994).

The ALJ supported his credibility finding by noting that Plaintiff gave contradictory accounts of his injury, stating at one point that he was lifting heavy merchandise and at another time claiming that he had merely turned his neck (Tr. 19). He commented that Dr. Mukhi had found in July, 2001 that Plaintiff could perform "sit down" work, belying Plaintiff's allegations at his hearing that he lacked the concentration to even to watch T.V. or listen to the radio (Tr. 20).

The ALJ noted that Dr. Mukhi observed in the summer of 2001 that Plaintiff demonstrated a good range of neck motion during conversation, tensing his neck muscles only upon direct examination of his neck (Tr. 20 *citing Tr. 161*). He also cited Plaintiff's application for benefits, which stated that he experienced weakness in his arms and later complained of hand and foot numbness, contradicting his statements to Dr. Mukhi that he did not experience numbness (Tr. 22). Finally, the ALJ found that "[a]ny lingering doubts about [Plaintiff's] lack of credibility [were] laid to rest" by his failure to put forth "his best effort on the Wechsler Adult Intelligence Scales (3rd ed) (WAIS-III)," which according to the examiner invalidated a portion of the results (Tr. 22 *citing Tr. 218*).

In closing, the Court notes that although Step Two findings of non-disability are less

common than Step Four or Five determinations, in this case, the ALJ amply supported his conclusion that Plaintiff's claim was "totally groundless." The hearing transcript and administrative decision indicate that the ALJ undertook a thorough analysis, considering the testimony of the VE as well as information submitted after the hearing before making his finding (Tr. 20). The ALJ stated that "I have struggled in vain to find any objective medical evidence that supports the things [Plaintiff] and Mrs. Jaber have alleged" (Tr. 19). The ALJ, who appeared to have scoured the record for information to support Plaintiff nonetheless determined that his allegations were in large part incredible. Plaintiff has not provided this Court with any basis to set aside that determination.

### B. Plaintiff's Physicians

Plaintiff further argues that the ALJ improperly discounted the opinions of four examining and treating physicians in making his Step Two finding, maintaining that the ALJ "misunderstood the symptoms and signs of spasmodic torticollis." *Plaintiff's Brief* at 13. He faults the ALJ for declining to give any weight to the physicians who pronounced Plaintiff disabled. *Plaintiff's Brief* at 16 *citing (Tr. 20).*

*Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 (footnote 7) (6th Cir. 1991) states that "it is well-settled in this circuit that treating physicians' opinions, based on objective evidence, should be accorded significant weight. If uncontradicted, the physicians' opinions are entitled to complete deference." In *Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544 (6th Cir. 2004) the court stated:

> "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion."

However, in *Warner v. Commissioner of Social Sec.,* 375 F.3d 387, 391 (6th Cir. 2004), the court found first that the ALJ's rejection of the treating physician's conclusion was based on substantial evidence, and second, that the ALJ properly supported his finding by citing other portions of the medical record that conflicted with the treating physician's opinion.

Even if the court concedes, *arguendo*, that an analysis of the first three considerations in *Wilson,* ( length of the treatment relationship, frequency of examination, and the nature and extent of the treatment relationship) requires the court to give treating physician deference to all of the physicians who made disability pronouncements, the ALJ permissibly found that those opinions were not entitled to any weight. First, as discussed at length in section **A.**, none of the opinions were supported by objective medical findings, but instead, reiterated Plaintiff's subjective, self-reported allegations, many of which the ALJ properly rejected. The nearest any physician came to supporting his diagnosis was Dr. Schwyn's February, 2001 report which stated that Plaintiff had "been experiencing signs and symptoms

that look like cervical dystonia."[5] As noted by the ALJ, "Dr. Schwyn, however, did not identify any of the signs he was referring to, nor did he list any objectively-determined abnormalities from his own examination" (Tr. 19 *citing Tr. 123*).

Second, the ALJ supported his rejection of the disability opinions with substantial evidence found elsewhere in the record. As noted above, Dr. Voelpel stated at the hearing that Plaintiff's MRI scans and x-rays failed to show hypertrophy of the muscle groups due to prolonged muscle spasms associated with cervical dystonia and that Plaintiff did not present the physical symptoms of spasmodic torticollis (Tr. 268). Although Plaintiff places great significance on the findings of the mental examination which stated in part that Plaintiff would experience difficulties in the workplace, the examiner deferred to Plaintiff's allegations of "physical symptoms" rather than information drawn from results of his own mental exam (Tr. 221). Further, the examiner qualified those findings by stating at several points in his report that his conclusions were based in part upon what he deemed to be an invalid IQ score due to Plaintiff's failure to put forth "his best effort" (Tr. 218, 220).

While the administrative decisions do not regularly make Step Two disability determinations, this decision, while unusual, has been well supported by the ALJ's findings. The overriding question in this appeal is whether the ALJ's decision was supported by substantial evidence. Based on a review of this record the ALJ's decision is within the "zone of choice" accorded to the fact-finder at the administrative hearing level, *Mullen v. Bowen*,

---

[5]Dr. Schwyn did not make a disability pronouncement.

*supra*, and should not be disturbed by this Court.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN

-17-

UNITED STATES MAGISTRATE JUDGE

Dated: June 20, 2005

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 20, 2005.

s/Gina Wilson
Case Manager

-18-